Filed 12/12/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| JEREMIAH MATHEWS, <br><br>     Plaintiff and Respondent, <br><br> v. <br><br> HAPPY VALLEY CONFERENCE CENTER, INC. et al., <br><br>     Defendants and Appellants. | H043723 & H044098 <br> (Santa Cruz County <br>  Super. Ct. No. CV179346) |

Plaintiff Jeremiah Mathews worked as a maintenance supervisor and a cook for defendant Happy Valley Conference Center, Inc. (Happy Valley), which hosts seminars, retreats, and camps on a 30-acre property in the Santa Cruz Mountains. Happy Valley is a subordinate affiliate of defendant Community of Christ (the Church). When a younger male employee confided in plaintiff that Happy Valley's female executive director had been sending him sexually inappropriate text messages, plaintiff reported the allegation to a member of Happy Valley's board of directors and to the Church's general counsel. The executive director admitted sending the messages, was reprimanded, and was allowed to continue supervising plaintiff and the younger male employee. Plaintiff was terminated less than a month after reporting the harassment. Plaintiff sued defendants, alleging retaliatory termination under several legal theories. The jury returned special verdicts in plaintiff's favor on all causes of action. Defendants were ordered to pay almost $900,000 in damages (including punitive damages) and almost $1 million in attorney's fees.

Defendants contest most of the jury's findings. Relevant to most appellate issues, defendants argue the Church cannot be held liable for Happy Valley's actions because the

two are separate entities that do not fall within the single employer doctrine. They further argue the trial court's single employer doctrine jury instruction was prejudicially erroneous.

Regarding liability, defendants argue that Happy Valley is not liable under title VII of the Civil Rights Act of 1964 (Title VII; 42 U.S.C. § 2000 et seq.) because Happy Valley does not have enough full-time employees to come within that law. Defendants also contest their liability under the California Fair Employment and Housing Act (FEHA; Gov. Code, § 12900 et seq.) because they are exempt religious entities, and contend the trial court erred in finding they had waived or were estopped from claiming the religious entity exemption. Defendants assert they are not liable under the version of the whistleblower statute in effect at the time of the events at issue (rather than the amended statute reflected in the parties' proposed jury instructions). They also argue the evidence was insufficient to support a finding that the Church breached an implied or actual contract with plaintiff.

Regarding damages, defendants contend the trial court awarded damages under Title VII beyond the maximum value allowed by that statutory scheme; noneconomic and punitive damages not recoverable for breach of contract; excessive punitive damages; and attorney's fees not recoverable as a matter of law.

As we will explain, we find no prejudicial error regarding most of defendants' appellate arguments, but the judgment must be modified to reflect that defendants are exempt from FEHA liability.

## I. TRIAL COURT PROCEEDINGS

The following factual summary is based on trial testimony and evidence admitted during the jury trial.

### A. DEFENDANTS' ORGANIZATIONAL STRUCTURES

The Church is a Missouri non-profit corporation with around 250,000 members in over 60 countries. The Church is separated geographically into Mission Centers. The

2

Sierra Pacific Mission Center covers, among other areas, the County of Santa Cruz and the Happy Valley property.

Happy Valley is a California non-profit corporation. According to Happy Valley's bylaws, it is an "integral subordinate unit and part of the Community of Christ." It is "accountable to General Church Officers to include the Apostle in charge of the field, the Presiding Bishopric and the First Presidency and Sierra Pacific Mission Center officers." Happy Valley is run by a volunteer board of directors (Happy Valley Board). The bylaws state the Happy Valley Board "shall regard the Sierra Pacific Mission Center as the body to which it is initially accountable for management of the Conference Center." The Happy Valley Board consists of elected members and ex officio members. The elected members are "elected by the Conference of the Sierra Pacific Mission Center." And the ex officio members are the Sierra Pacific Mission Center president and the Mission Center's financial officer. Ronald Smith was the Sierra Pacific Mission Center president at all relevant times. Happy Valley also has an executive committee made up of four members of the Happy Valley Board. Ronald Smith and Happy Valley Board President Jerry DeVries were members of the executive committee.

Happy Valley had three full-time employees: an executive director, a food services manager, and a maintenance supervisor. For the time period preceding plaintiff's termination, the executive director was Melinda Gunnerud, the food services manager was Amanda McKnight, and plaintiff was the maintenance supervisor. Happy Valley also employed part-time and seasonal employees, especially during the summer months.

### B. PLAINTIFF'S HISTORY WITH HAPPY VALLEY AND REPORTS OF HARASSMENT

Plaintiff was hired by Happy Valley as a cook in 2009. He received periodic raises based on his performance. His performance reviews were generally positive, but plaintiff received lower scores for his communication skills and attitude. At trial plaintiff acknowledged he sometimes lost his temper at work, and also acknowledged receiving at

3

least three disciplinary write-ups during his time working for Happy Valley. All were related to plaintiff losing his temper with other employees. Plaintiff changed positions from part-time cook to full-time maintenance supervisor in late 2010. Both executive director Gunnerud and food services supervisor McKnight acknowledged at trial that Gunnerud frequently praised plaintiff for his hard work and cooking skills.

Dianne Barnett, a former bookkeeper for Happy Valley, testified that she worked there while Gunnerud was the executive director. Barnett stated that several employees complained to her about Gunnerud being unfair and treating employees poorly. Barnett related that employees would inform Happy Valley Board President Jerry DeVries about Gunnerud's conduct, but that DeVries did not take the concerns seriously. According to Barnett, when employees brought their concerns about Gunnerud to DeVries, he would report that information back to Gunnerud and then Gunnerud would discipline the employees in retaliation.

Food services supervisor McKnight testified that Gunnerud frequently flirted with younger male employees and commented on their physical appearance. (We refer to two of the former employees by their first names in the interest of their privacy.) McKnight testified Gunnerud seemed a "little delusional" about the nature of her relationship with a dishwasher named Eli. Gunnerud told McKnight she had gone to Eli's house to see him without his permission. McKnight did not think Gunnerud understood that Eli was uncomfortable with the interaction. McKnight testified that even after Eli resigned, Gunnerud continued trying to spend time with him including going to see him at his new job. Gunnerud also sent Eli text messages, which we will discuss in greater detail.

Brett began working at Happy Valley after Eli left. McKnight testified that Gunnerud took Brett on shopping errands offsite, which was a task she used to do without assistance from others. Brett testified that at first he felt welcomed and comfortable, but that he started to feel like he was receiving special treatment from Gunnerud. The treatment made him feel "kind of strangely." Brett testified that Gunnerud began sending

4

him personal text messages after work hours, which eventually focused on "more and more suggestive" topics. Brett stated he confided in plaintiff about inappropriate text messages received from Gunnerud when he reached a point where he no longer felt comfortable at work. Brett went to plaintiff because he looked up to plaintiff and plaintiff was the person at Happy Valley with whom Brett was most comfortable talking.

Plaintiff confirmed in his trial testimony that Brett showed him text messages from Gunnerud in mid-April 2012. Among the text messages Brett showed plaintiff were the following: "Not such a great night. Currently driving around looking for a place to get a stiff one after getting in a fight with the hubby"; "I'm glad red didnt give u trouble getting in the house....i did tell him to guard my underwear drawer though!" (Errors in original.) Gunnerud admitted in her trial testimony that she sent those and other text messages to Brett.

Brett and plaintiff took the text messages to McKnight. According to McKnight, she was uncomfortable reporting the text messages to Gunnerud or DeVries for fear of retaliation, so she decided to ask a Happy Valley Board member, Karen Ardito, for help. Ardito testified that once she learned about the text messages, she asked her friends in the Church for advice and those friends recommended that she contact Karen Minton, the Church's general counsel. Minton testified that plaintiff and Brett reported the messages to her, and that they told her they feared retaliation by Gunnerud.

Minton believed the messages constituted sexual harassment, and she asked Sierra Pacific Mission Center President (and ex officio Happy Valley Board and executive committee member) Smith to investigate them. Minton testified that she looked to Smith because she had worked with him before on Church business. The plan was for Smith to investigate, confer with Minton, and then provide a recommendation to Happy Valley President DeVries.

Smith testified that he reviewed the text messages Gunnerud sent Brett and thought they were "joke[s] in poor taste" rather than sexual harassment. Soon after

5

beginning the investigation, Smith learned from plaintiff about text messages Gunnerud had sent to Eli, the former employee. Eli sent Smith an e-mail with copies of the text messages, which included the following: "Did i ever tell u that the night u stayed at my house i hardly slept a wink? I confess that i snuck in and watched you sleeping, naked and surrounded by pillows and totally adorable. One of lifes precious moments. Hope i get to see u tomorrow. Good night and sleep tight. Love u eli."; "Did he tell thats only after long bouts of exausting, hot nasty ***?! Speaking of which, my boss is coming to take me to 'lunch' tomorrow ... olitas and football baby! Last time we had a little too much to drink but we had a great time! ;) im so bad ..."; "Im off! How about a really loooong quikie...or...we could just go to a movie." (Errors in original.) Gunnerud confirmed at trial that she sent those text messages to Eli.

Smith and another Happy Valley Board member interviewed Brett, Eli, and Gunnerud. Smith testified that he thought Gunnerud attempted to sugarcoat the severity of the texts by arguing that they were all jokes. He testified that Gunnerud reported feeling betrayed by the other employees' decision to disclose her text messages. Smith thought Eli seemed cavalier, and appeared to be treating the matter like a game.

Smith recorded notes during the investigation, which were admitted into evidence at trial. In those notes he stated his belief that plaintiff was trying to stir the pot and make trouble by reporting Gunnerud. He accepted Gunnerud's statement that she was merely trying to make jokes, and he did not think she harbored any "malicious or lascivious" intent. He thought Eli was "trying to paint it as worse than it really was (for whatever reason; collusion with [plaintiff]?)."

Smith ultimately recommended to DeVries that Gunnerud be reprimanded, with directions to undergo management training about maintaining appropriate boundaries with employees. DeVries followed Smith's recommendation and reprimanded Gunnerud. DeVries testified that he thought the texts were, at most, "borderline"

6

harassment. Gunnerud was allowed to maintain her executive director position with supervisory authority over plaintiff and Brett.

About a week after reporting the text messages to Minton, plaintiff informed Smith via e-mail that Brett was "terrified" that Gunnerud had found out about the sexual harassment report. Plaintiff warned that Gunnerud was vindictive and retaliatory. Smith stated in an e-mail to DeVries that Brett denied being terrified about losing his job. Plaintiff testified at trial that Brett had indeed expressed being terrified. Plaintiff stated Brett was not comfortable talking to people affiliated with Happy Valley or the Church about the harassment, and suggested that was the reason Brett might not have appeared terrified to Smith. In a separate e-mail to Minton, plaintiff expressed his dissatisfaction with the plan to allow Gunnerud to continue supervising him and Brett. He informed Minton in that e-mail that he felt his only option was to explore legal action.

The Happy Valley Board met in late April 2012. Gunnerud updated the Board about Happy Valley operations and—according to testimony by multiple Board members at trial—Gunnerud also praised plaintiff's hard work. In a closed session without Gunnerud present, DeVries informed the Board that plaintiff was the person who had reported the text messages sent to Eli and Brett.

Minton, Smith, and DeVries exchanged several e-mails in the days before and after the Happy Valley Board meeting regarding both the harassment investigation and plaintiff's claims of retaliation. Smith and DeVries were skeptical of plaintiff's motives. DeVries speculated in an e-mail about what plaintiff might stand to gain from reporting Gunnerud. He suggested it might be a way for him to avoid discipline for other misconduct, as there had been allegations that plaintiff had used a Happy Valley work computer to access pornography. DeVries also mentioned that a few months earlier he had talked to Gunnerud about replacing plaintiff because of plaintiff's anger issues, and speculated that plaintiff may have learned about that discussion. DeVries concluded his e-mail as follows: "I really do not want to fire him without legal or HR advice, because I

7

don't want to open the possibility of paying him a dime in any kind of settlement ... He is a liability." Smith responded that he thought DeVries was giving plaintiff too much credit for doing anything more than "picking a fight." Smith speculated plaintiff could be motivated by "revenge, could be simple anger (we know he flies off the handle too easily), could be hatred for [Gunnerud] or for the world at large."

Gunnerud met with plaintiff later that month to discuss plaintiff's work assignments. Plaintiff was upset that Gunnerud was still his supervisor. Gunnerud asked DeVries to join the meeting. Plaintiff testified that the first thing DeVries said to plaintiff when he arrived was "[w]hat's your problem?" Plaintiff, DeVries, and Gunnerud argued about what plaintiff viewed as deficiencies in Happy Valley's investigation of the harassment complaint, and plaintiff acknowledged at trial that during the meeting he referred to Gunnerud as a "lying, cheating whore." Plaintiff asked for a new supervisor, and the parties eventually agreed that Happy Valley Board member Bob Thomas would take over. Plaintiff testified that Thomas told him at their initial meeting that had Thomas already been plaintiff's supervisor he would have fired plaintiff on the spot.

Plaintiff alleged in an e-mail to DeVries sent the day after Thomas took over as plaintiff's supervisor that Gunnerud was on a "witch hunt" and was trying to convince Happy Valley employees to "retro-write" complaints against plaintiff to create evidence to support his termination. McKnight testified at trial that Gunnerud had asked her around that time to write a complaint about plaintiff for something that had happened in the past and McKnight refused to do so. Plaintiff testified at trial that his e-mail was referring to Gunnerud's request to McKnight. DeVries forwarded the "witch hunt" e-mail to Smith, who in turn forwarded it to Minton a few days later and told her: "It's all crap; nothing of this is happening." Smith acknowledged at trial that he never independently investigated whether there was truth to plaintiff's allegations. Plaintiff also e-mailed Minton to inform her he was "pursuing state and federal complaints" due to what he perceived as an unsatisfactory response to the harassing text message

8

investigation. (Capitalization omitted.) Plaintiff e-mailed the United States Equal Employment Opportunity Commission that day, stating he had been "retaliated against in relation to another employee[']s sexual harassment complaints." (Capitalization omitted.)

Plaintiff met with Thomas five days after notifying Minton of his intention to pursue state and federal complaints. Thomas was dissatisfied with the amount of work plaintiff had completed the day before. Plaintiff testified that Thomas complained the cabins were not clean and there was debris in a causeway, and that plaintiff told him those tasks were not part of his job description as there was a separate cleaning crew assigned to those tasks. A heated argument ensued and Thomas terminated plaintiff. DeVries testified that the stated reasons for plaintiff's termination were insubordination and failure to timely complete assigned tasks. During a portion of his deposition played for the jury, Thomas testified that he did not know plaintiff was the person who had reported Gunnerud when he chose to terminate plaintiff. But the Happy Valley Board meeting minutes indicate Thomas was at the meeting where DeVries described plaintiff's allegations against Gunnerud. And Happy Valley Board member Barnett testified both that DeVries mentioned plaintiff by name at the meeting's closed session and that Thomas was in attendance.

## C. ADMINISTRATIVE COMPLAINT, LITIGATION, AND TRIAL

Plaintiff filed a form Charge of Discrimination complaint with the United States Equal Employment Opportunity Commission some eight months after his termination, alleging he was retaliated against in violation of Title VII and FEHA. Happy Valley and the Church filed a joint response, which was signed by Minton as counsel. The California Department of Fair Employment and Housing issued a right to sue letter in response to plaintiff's administrative complaint.

Plaintiff's operative first amended complaint (Complaint) alleged eleven causes of action against Happy Valley and the Church: (1) retaliatory termination violating

9

Title VII; (2) retaliatory termination violating FEHA; (3) failing to prevent retaliation (Gov. Code, § 12940, subd. (k)); (4) declaratory relief as to the scope of FEHA's religious entity exemption and the interpretation of the Happy Valley employee handbook; (5) breach of contract (related to the employee handbook); (6) breach of the implied covenant of good faith and fair dealing (also related to the employee handbook); (7) failure to timely produce employment records (Lab. Code, §§ 1198.5, 432); (8) failure to timely produce wage records (Lab. Code, § 226); (9) defamation; (10) retaliation against a whistleblower (Lab. Code, § 1102.5); and (11) blacklisting (Lab. Code, § 1050). (Plaintiff dismissed the defamation and blacklisting causes of action before trial.) Plaintiff sought compensatory damages, punitive damages, back pay, front pay, penalties for Labor Code violations, and attorney's fees.

Before the jury trial, the declaratory relief cause of action on the FEHA religious entity exemption was tried to the court. After a multiple-week jury trial, the jury returned special verdicts in plaintiff's favor against Happy Valley and the Church on all causes of action with less than one day of deliberation. The jury awarded plaintiff $275,000 in non-economic damages, $120,550 in economic damages, $1,500 as a penalty for two violations of Labor Code sections 226 and 1198.5 (for untimely production of wage and employment records), and $1,500 as a penalty for violating Labor Code section 1102.5 (the whistleblower statute). The jury awarded plaintiff $500,000 in punitive damages after hearing additional evidence. All damages were imposed against defendants jointly and severally. The trial court awarded plaintiff a total of $986,812.50 in attorney's fees. Defendants appealed from the judgment (case No. H043723) and later appealed the post-judgment attorney's fees order (case No. H044098). (We ordered the appeals to be considered together.)

## II.  DISCUSSION

We address defendants' contentions in the following order: whether substantial evidence supports the jury's special verdict finding that Happy Valley and the Church

10

were a single employer; whether the trial court prejudicially erred in instructing the jury regarding the single employer doctrine; whether the trial court erred in determining that defendants waived or were estopped from asserting a religious entity exemption to FEHA liability; whether the jury's whistleblower liability finding must be reversed because the court's instruction to the jury was based on the wrong version of the whistleblower statute; whether substantial evidence supports the special verdict finding of a breach of an actual or implied contract against the Church based on Happy Valley's employee handbook. We then address arguments related to damages.

## A. TITLE VII

Defendants do not contest the jury's finding that plaintiff was terminated in retaliation for reporting sexual harassment, which would violate Title VII. Instead, they argue that neither Happy Valley nor the Church can be held liable for retaliatory termination because Happy Valley does not meet the 15-employee threshold for Title VII liability (42 U.S.C. § 2000e(b)), and the Church is not liable under Title VII despite having more than 15 employees because it was not the entity that terminated plaintiff. The jury found that Title VII applied because Happy Valley and the Church were so interrelated that they constituted a single employer. Defendants argue the jury's single employer finding is unsupported by the evidence. They also contend the trial court provided a prejudicially erroneous jury instruction about the single employer doctrine.

### 1. The Single Employer Doctrine and the Integrated Enterprise Test

The parties agree that the integrated enterprise test is accurately summarized in *Laird v. Capital Cities/ABC, Inc.* (1998) 68 Cal.App.4th 727 (*Laird*) (not followed on another ground by *Reid v. Google* (2010) 50 Cal.4th 512, 524). "The federal courts have developed a test, derived from federal labor case law, to determine whether two corporations should be considered a single employer for title VII purposes. Commonly called the 'integrated enterprise' test, it has four factors: interrelation of operations, common management, centralized control of labor relations, and common ownership or

11

financial control." (*Laird*, at p. 737.)  The test was "designed to further Congress's intent that title VII be construed liberally, including its definition of the term 'employer.' " (*Laird*, at p. 738.)  Common ownership or control alone is never enough to establish single employer liability, and courts "often deem centralized control of labor relations the most important" factor.  (*Ibid.*)  " 'The critical question is, "[w]hat entity made the final decisions regarding employment matters related to the person claiming discrimination?" ' "  (*Ibid.*)

### 2.  Trial Evidence Related to the Single Employer Finding

Plaintiff testified he believed the Church owned Happy Valley.  Happy Valley Board member Barnett testified that "Happy Valley reports to the mission center." Happy Valley Board member Patricia Carver testified that the procedure for reporting sexual harassment occurring at Happy Valley involved reporting the harassment to the Happy Valley Board, proceeding up the chain to the Sierra Pacific Mission Center, and continuing upward through the Church hierarchy.  Gunnerud similarly testified that the protocol for sexual harassment complaints would be to report the matter to the Happy Valley Board, and then to "the person above that, ... who I believe would be Ron Smith, and then above that would be the World church."  Those statements are consistent with Happy Valley's bylaws, which refer to Happy Valley as an integral subordinate unit of the Church and state that the Happy Valley Board "shall regard the Sierra Pacific Mission Center as the body to which it is initially accountable for management of the Conference Center."  Defendants acknowledge on appeal that "Happy Valley's financial statements are internally audited by the Church."  And DeVries testified that Happy Valley employees can obtain health insurance through the Church's health insurance system.

Smith, DeVries, and Minton each testified that the Church exerted no control over Happy Valley's decision to terminate plaintiff.  But other testimony and evidence related to those individuals suggested a closer relationship between Happy Valley and the Church.  Smith testified that, as a general matter, the Sierra Pacific Mission Center

12

president provides oversight to subordinate affiliates like Happy Valley. He responded affirmatively when asked if, generally speaking, in his "capacity as the mission center president, ... [he was] acting essentially in the shoes of the church in terms of [his] administration of the jurisdictions here within [his] area of California." And he acknowledged he was the main information conduit between Happy Valley and the Church. Regarding Minton selecting him as the investigator for the sexual harassment complaint against Gunnerud, Smith acknowledged he was likely chosen because as the Sierra Pacific Mission Center president he had responsibility for the wellbeing of the mission center as a whole. And Smith acknowledged that as the ex officio Happy Valley Board member he was the liaison between Happy Valley and the Church. Printouts of several e-mail communications between Smith and other individuals were admitted into evidence. Those include one to Minton in which Smith referred to plaintiff as a "troublemaker" and assured her they would talk to her "before any action is taken." In another e-mail sent five days before plaintiff was terminated, Smith requested a conference call with DeVries and Minton because plaintiff was "out of control" and "[w]e have to do something soon."

Minton denied being a decision-maker, but she acknowledged that Smith kept her apprised of developments about the sexual harassment investigation. She also agreed that she provided input to Smith and DeVries about the investigation. She was asked about prior inconsistent statements from her deposition: When asked in deposition to define what was meant by Happy Valley being a subordinate affiliate of the Church, Minton responded: " 'The church has -- the church is hierarchical in its structure so ultimately the church leadership is responsible for all of the entities affiliated. There [are] multiple jurisdictions. They used to be called stakes; currently they're called mission centers. The mission centers do not have separate -- they are not separate entities. Some of those entities have other ministries. We are a church. We provide ministry. We're focused on mission. And we provide that mission in multiple ways. Our mission centers are

13

affiliates, but they are the church, so there is no distinction between -- no legal distinction between the church and our mission centers or our smaller congregations. They are us, we are them. And that would be the same at our campgrounds. And Happy Valley is one of our campgrounds.' "

The trial court allowed the jury to submit proposed questions for each witness. One jury question asked of Minton was, "Knowing that this could go to court, that someone might sue, and that the church might be pulled into the whole affair, why didn't you insist that Happy Valley and the Board take necessary steps to cover all the legal and ethical bases?" Minton responded: "I gave my opinion. I told them what I believed. But I -- I have no authority over them. I can't force them to do it because they're a separate corporation, they're a separate entity." In response to another question Minton stated "I was not legal counsel to Happy Valley" during the sexual harassment investigation.

The location of plaintiff's personnel file following his termination is also relevant to defendants' interrelatedness. McKnight testified that following plaintiff's termination Gunnerud removed plaintiff's personnel file from the Happy Valley property. Minton acknowledged that when first contacted via e-mail by plaintiff's counsel about the file she responded that the Church had " 'no record that Mr. Mathews was an employee of the Community of Christ and consequently has no personnel files.' " Minton confirmed that she at some point discovered plaintiff's personnel file was with the Sierra Pacific Mission Center; the file had been given to Patricia Carver's husband Mike Carver, who was the CFO of the Sierra Pacific Mission Center and also a Happy Valley Board member. Minton acknowledged that she sent a copy of plaintiff's personnel file to the EEOC, but also that she told plaintiff's counsel two months *after* the EEOC filing that she was still compiling the file. She offered no explanation for that discrepancy.

14

### 3. Opening and Closing Arguments, and Verdict

Defendants did not discuss the single employer doctrine in either their opening statement to the jury or their closing argument. Their opening statement discussed Happy Valley and the Church, noting they were "committed to the Christian principles upon which they're founded, the golden rule, redemption, second chances, kindness to one another. These are the fundamental principles upon which the church and Happy Valley, as an extension, believe in and are committed to." Their closing argument focused largely on attacking plaintiff's credibility. Defense counsel concluded the closing argument as follows: "Mr. Mathews has lied. He's destroyed evidence. He's abused people. He has manipulated women who were blinded by their own biases and hatred of others. People don't behave the way Mr. Mathews behaved and keep their jobs. People don't get rewarded for the type of conduct that Mr. Mathews has exhibited in this case. It's time for Mr. Mathews' manipulations to be over. It's time for you to tell Mr. Mathews to take responsibility for what he's done."

A special verdict form posed the following question: "When Jeremiah Mathews was discharged from his employment in May 2012, were Happy Valley Conference Center and the Community of Christ sufficiently related so as to be considered a 'single employer' of Jeremiah Mathews, and therefore jointly responsible for each other's acts?" The jury answered "Yes."

### 4. Substantial Evidence Supports the Single Employer Finding

Defendants argue "the record does not support" the jury's single employer finding. Contrary to defendants' argument that all their appellate arguments raise issues of law and are therefore reviewed de novo, we review a jury's factual findings for substantial evidence. We will reverse a jury's verdict only if it is unsupported by any substantial evidence, meaning to prevail on appeal defendants must show that the evidence was such as would justify a directed verdict in their favor. (*Sanchez-Corea v. Bank of America* (1985) 38 Cal.3d 892, 906.) When applying the substantial evidence test, "we resolve

15

'all conflicts in the evidence and all legitimate and reasonable inferences that may arise therefrom in favor of the jury's findings and the verdict.' " (*Murray's Iron Works, Inc. v. Boyce* (2008) 158 Cal.App.4th 1279, 1285.) We do not reweigh the evidence or judge the credibility of witnesses. (*Ibid.*) The "power of the appellate court is limited to a determination of whether there is any substantial evidence, contradicted or uncontradicted, that will support the verdict." (*Zhadan v. Downtown Los Angeles Motor Distributors, Inc.* (1979) 100 Cal.App.3d 821, 833 (*Zhadan*).)

As to the four factors—interrelation of operations, common management, centralized control of labor relations, and common ownership or financial control—defendants concede common ownership because in "the parent-subsidiary context, common ownership is a given." Though Happy Valley was somewhat financially independent from the Church, defendants acknowledge that Happy Valley's financial statements are audited by the Church, which may indicate some measure of financial control or oversight. Regarding common management, Happy Valley's Board consisted of: (1) elected members who, according to Happy Valley's bylaws, were "elected by the Conference of the Sierra Pacific Mission Center"; and (2) ex officio members (like Sierra Pacific Mission Center President Ronald Smith) serving by virtue of their management positions with the Church's Sierra Pacific Mission Center. The Happy Valley Board was thus closely intertwined with the greater Church organization. Smith held both a high position within the Church and a position on Happy Valley's four-person executive committee. Regarding interrelated operations, Happy Valley's bylaws state that it is an "integral subordinate unit and part of" the Church that is "accountable to General Church Officers" as well as to the Sierra Pacific Mission Center. Happy Valley employees can take advantage of the Church's health insurance. And the jury heard Minton's deposition testimony suggesting interrelated operations: "Our mission centers are affiliates, but they are the church, so there is no distinction between -- no legal distinction between the church and our mission centers or our smaller congregations. They are us, we are them.

16

And that would be the same at our campgrounds. And Happy Valley is one of our campgrounds." Defendants argue Minton's deposition testimony was "legally mistaken and therefore of no significance." But the jury was charged as fact-finder with determining the relationship between Happy Valley and the Church, and the jury evidently credited Minton's deposition testimony over her contradictory trial testimony.

As for centralized control of labor—often considered the most important factor (*Laird*, *supra*, 68 Cal.App.4th at p. 738)—the jury heard testimony from Happy Valley Board member Barnett that Happy Valley reports to the Sierra Pacific Mission Center, as well as testimony from both Gunnerud and Happy Valley Board member Patricia Carver that sexual harassment reports originating at Happy Valley would make their way up the chain of command to the Church itself. And specifically related to plaintiff's termination, the evidence showed plaintiff's personnel file wound up in possession of the Church, which would have no independent reason to have the personnel file. Further evidence of centralized control of labor comes from the extensive involvement of Smith, the Church's liaison with Happy Valley, in plaintiff's termination. Smith called plaintiff a troublemaker in an e-mail to Minton. Without personally investigating plaintiff's complaints about retaliation, Smith assured Minton that plaintiff's allegations were "all crap." Five days before plaintiff was terminated, Smith told DeVries and Minton that plaintiff was "out of control" and "[w]e have to do something soon." Those communications between the Church's general counsel, the president of the Church's Sierra Pacific Mission Center, and the president of the Happy Valley Board provide substantial evidence to support a reasonable inference that the decision to terminate plaintiff was influenced—or even dictated—by individuals acting on behalf of the Church.

Defendants point to evidence showing Happy Valley and the Church should be treated as separate entities for purposes of the single employer doctrine, including that the Church generally does not oversee Happy Valley daily operations; that Happy Valley has

17

its own employees who are generally hired, directed, supervised, and fired by Happy Valley; and that Happy Valley has its own employee handbook. But that argument invites us to reweigh the evidence and ignores our standard of review. We review whether substantial evidence supports the jury's single employer finding. That other evidence in the record would support a defense verdict is immaterial. (See *Zhadan*, *supra*, 100 Cal.App.3d at p. 833 ["The appellate court may reverse the decision only if there is no evidence to support the verdict."].)

Defendants contend the Church could not have been involved in plaintiff's firing because Happy Valley Board member Thomas was the person who ultimately fired plaintiff. But the final decision to terminate plaintiff did not occur in isolation. The evidence supported a finding that, his self-serving deposition testimony notwithstanding, Thomas knew that plaintiff was the person who complained about Gunnerud. And given the extensive communications between DeVries, Smith, and Minton in which plaintiff was characterized as a troublemaker who had to be dealt with, the jury could reasonably infer that those views influenced Thomas's ultimate decision to terminate plaintiff.

Defendants argue for the first time in their reply brief that even assuming Smith and Minton were involved in plaintiff's firing, they were involved only in their Happy Valley subsidiary roles and not in their Church corporate parent roles. (Citing *Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523; *United States v. Bestfoods* (1998) 524 U.S. 51, 69 ["courts generally presume 'that the [corporate] directors are wearing their "subsidiary hats" and not their "parent hats" when acting for the subsidiary' "].) Defendants forfeited that argument by failing to raise it until their reply brief (*Neighbours v. Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335, fn. 8), and in any event the authorities defendants cite did not apply the "two hats" concept in the single employer doctrine context. There was also evidence that Minton wore only a Church "hat" for the entire investigation: she testified in response to a jury question, "I was not legal counsel to Happy Valley" during the sexual harassment investigation. Nor

18

does the evidence compel the conclusion that Smith acted solely in his capacity as a Happy Valley Board member: Smith acknowledged he was Happy Valley's liaison to the Church, and also agreed with the characterization that "essentially it was your role within the church as the mission center president that was the guiding factor in having you be the investigator" of the harassing text messages.

### 5. Instructional Error

Defendants argue that the trial court erred in instructing the jury about the single employer doctrine because the jury instruction did not highlight the centralized control of labor relations factor. (Defendants preserved the issue by proposing an alternative instruction to the trial court and making there the argument they now make on appeal.) The parties agree that any instructional error here is subject to the state law prejudice standard, which calls for reversal only if "there is a reasonable probability that in the absence of the error, a result more favorable to the appealing party would have been reached." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 574.) We are also mindful that "[n]o judgment shall be set aside ... on the ground of misdirection of the jury ... unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13.)

### a. Factual Background

Each party proposed a jury instruction regarding the single employer doctrine. Defendants' proposal listed the four factors and then continued: "Of these factors, 'centralized control of labor relations' is most important. The central question is what entity made the final decisions regarding employment matters related to the person claiming retaliation." The trial court rejected defendants' requested instruction, reasoning that "it's part of the jury's province to decide under the facts of this case which

19

are the most important factors, and I think the plaintiff version accurately states that no single factor is conclusive."

The jury was instructed as follows about the single employer doctrine, using plaintiff's proposed instruction: "Jeremiah Mathews claims he was an employee of both Happy Valley Conference Center, Inc. and Community of Christ. Two or more entities may be considered a 'single employer' if certain factors are found to exist. [¶] In determining whether Happy Valley Conference Center and Community of Christ constitute a 'single employer' for purposes of this action, you should consider the following factors: [¶] (1) common ownership; [¶] (2) common management; [¶] (3) functional integration of operations; and [¶] (4) centralized control of labor relations. [¶] No single factor is conclusive and all four factors need not be present. The single employer standard places less emphasis on corporate form and assess[es] the economic reality of the corporate relationship. 'Single employer' status is characterized as an absence of an arm's-length relationship normally found among unintegrated companies. The ultimate question is whether there are sufficient facts indicating an interrelationship between the two companies such that a reasonable employee would have believed that one company was jointly responsible for the acts of the other. [¶] If you find that Happy Valley Conference Center and Community of Christ are sufficiently interrelated to constitute a 'single employer' for purposes of this action, you must treat the conduct of one organization as if it were the conduct of both organizations. If you find that Happy Valley Conference Center and Community of Christ are not sufficiently related to constitute a 'single employer' for purposes of this action, you must consider the conduct of each organization separately."

### b. The Trial Court Erred, but the Error Was Harmless

California and federal authorities consistently highlight centralized control of labor relations as a particularly important factor. (E.g., *Laird*, *supra*, 68 Cal.App.4th at

20

p. 738 ["Although courts consider the four factors together, they often deem centralized control of labor relations the most important."]; *Kang v. U. Lim America, Inc.* (9th Cir. 2002) 296 F.3d 810, 815 ["The third factor, centralized control of labor relations, is the 'most critical.' "].)  Plaintiff acknowledges as much in his brief, where he states that courts "consider shared control of labor relations as the primary factor."  Given the emphasis on the centralized control of labor relations factor, we agree with defendants that the trial court should have highlighted that factor in its single employer instruction.

Defendants contend the error is "obviously prejudicial" because evidence showing that Happy Valley and the Church were not a single employer was "overwhelming."  But defendants overstate both the error and the evidence presented to the jury.  The instruction given correctly identified the four factors and correctly informed the jury that no single factor is conclusive.  Its flaw was in not emphasizing the centralized control of labor factor.  The special verdicts—and the speed with which they were returned— support an inference that the jurors made adverse credibility determinations as to defendants' witnesses.  And as we have already summarized, substantial evidence supported the centralized control of labor.  Multiple witnesses testified that sexual harassment complaints related to Happy Valley would be reported to and handled by the Church.  Both the Church's general counsel and a high-ranking Church official (Sierra Pacific Mission Center President Smith) were extensively involved in discussions with Happy Valley Board President DeVries in the weeks leading up to plaintiff's termination.  And just days before plaintiff's termination Smith told the others they had to "do something soon" because plaintiff was "out of control."  Defendants have failed to show a reasonable probability that a result more favorable to them would have been reached had the trial court adopted defendants' version of the single employer doctrine instruction.

## B. FEHA

FEHA exempts from the definition of "employer" any "religious association or corporation not organized for private profit." (Gov. Code, § 12926, subd. (d); *Kelly v. Methodist Hospital of So. Cal.* (2000) 22 Cal.4th 1108, 1114.) Defendants argue they are exempt from FEHA liability under the religious entity exemption and that the trial court erred by finding they had waived or were estopped from asserting the exemption. Plaintiff does not dispute that each defendant is a religious non-profit corporation that would ordinarily be exempt from FEHA. But in addition to defending the trial court's waiver and estoppel determinations, plaintiff contends that defendants are liable even as otherwise exempt religious entities for *retaliation* under FEHA because the statutory scheme prohibits retaliation by "any employer, labor organization, employment agency, or person." (Gov. Code, § 12940, subd. (h).)

### 1. Factual and Procedural Background

Plaintiff sought a declaration that his "employment with [d]efendants was covered by the FEHA" and that defendants could not claim the religious entity exemption. Before the jury trial began, the trial court heard testimony from Happy Valley Board President DeVries about how the Happy Valley employee handbook was created. He testified that Happy Valley purchased software from the California Chamber of Commerce that contained standardized employee handbook policies which had been "reviewed by attorneys and that for California law." DeVries worked with the rest of Happy Valley's executive committee to choose policies from the software and compile them into the Happy Valley employee handbook. He testified there was no option in the software to pick policies written specifically for religious entities. The handbook was sent to the Church's general counsel for review, and Happy Valley never received any feedback.

As adopted and provided to plaintiff during his employment, the employee handbook stated Happy Valley's company policy "prohibits unlawful discrimination based on race, color, creed, gender, religion, marital status, registered domestic partner

22

status, age, national origin or ancestry, physical or mental disability, medical condition including genetic characteristics, sexual orientation, or any other consideration made unlawful by federal, state, or local laws." The handbook continued that Happy Valley is "committed to compliance with all applicable laws providing equal employment opportunities." The handbook also prohibited any harassment based on a lengthy list of characteristics. It identified harassment as unlawful, and instructed employees to report any harassment to a supervisor or other managerial employee. The handbook further stated: "You should be aware that the Federal Equal Employment Opportunity Commission and the California Department of Fair Employment and Housing investigate and prosecute complaints of prohibited harassment in employment. If you think you have been harassed or that you have been retaliated against for resisting or complaining, you may file a complaint with the appropriate agency."

Plaintiff filed his retaliation administrative complaint with the EEOC. By signing the form complaint, plaintiff agreed with the pre-printed text stating the charge would be "filed with both the EEOC and the State or local agency" (i.e., the California Department of Fair Employment and Housing). The Department of Fair Employment and Housing later notified plaintiff and defendants that it would not be investigating the matter in light of the EEOC investigation, and stating "[n]o response to the [Department of Fair Employment and Housing] is required" from defendants. (Boldface and underlining omitted.) The notice of charge of discrimination that the EEOC sent defendants informed them that plaintiff had filed a complaint under Title VII. The EEOC notice did not reference FEHA. Defendants did not raise the FEHA religious entity exemption during the EEOC investigation.

The trial court deferred deciding the declaratory relief issue until it heard more evidence during the jury trial. The trial court ultimately decided that the issue of liability under FEHA would go to the jury because defendants waived and were estopped from raising the religious entity exemption. The trial court based its determination on "the

23

employee handbook and the fact that the church, while represented by general counsel, did not assert that possible defense, that combination shows that they waived that exemption." The court also noted that because DeVries sent the handbook to the Church for review, the Church "had every opportunity to assert their claim to be exempt." The trial court cited similar evidence to support estoppel, and concluded there had been detrimental reliance by plaintiff because he chose "to pursue these claims and expend all the money in the pursuit of these claims, which he could do in reliance on the fact of the employee manual and reliance on the fact that the church did not assert the estoppel [*sic*] when the claim was brought administratively." (We assume the word "exemption" was intended instead of "estoppel".)

### 2. Defendants Did Not Waive the Exemption

As the foregoing essential facts are undisputed, we review de novo the trial court's decision that defendants waived the religious entity exemption. (*Platt Pacific, Inc. v. Andelson* (1993) 6 Cal.4th 307, 319.) Waiver is "the voluntary relinquishment of a known right, which may be effective as a matter of law without any demonstration that the other party was caused by the waiver to expose [itself] to any harm." (*City of Hollister v. Monterey Ins. Co.* (2008) 165 Cal.App.4th 455, 487.)

Plaintiff argues the trial court correctly found defendants waived the exemption based on the following actions: defendants' failure to raise the exemption during the EEOC administrative proceedings; the Happy Valley employee handbook's prohibition on discrimination, harassment, and retaliation as well as its references to "state or local law" and to the California Department of Fair Employment and Housing; and defendants' delay in raising the exemption during litigation.

We consider those bases in order. The EEOC notified defendants it was investigating a potential Title VII violation, *not* a FEHA violation. As such, application of a FEHA exemption was immaterial to the EEOC proceedings and failure to raise it in that context did not waive the exemption. Regarding the employee handbook, DeVries's

24

testimony indicated that Happy Valley chose boilerplate employee handbook content from a business association's software. Plaintiff repeatedly references the handbook's "FEHA and EEOC protections." But the handbook never explicitly references FEHA. The handbook states that Happy Valley prohibits harassment, discrimination, and retaliation; that Happy Valley is "committed to compliance with all applicable laws providing equal employment opportunities"; and that employees "should be aware that the Federal Equal Employment Opportunity Commission and the California Department of Fair Employment and Housing investigate and prosecute complaints of prohibited harassment in employment." The handbook makes no promise that defendants will be bound by FEHA; the handbook refers to being bound by "applicable" laws. Especially considered in the context of its creation, nothing in the handbook amounts to a knowing and voluntary waiver of the religious entity exemption.

As for defendants' purported delay, plaintiff put the exemption in issue with the Complaint's declaratory relief cause of action and the reference to defendants' contention that "as religious non-profit organizations, [they] were not covered by the FEHA." Defendants answered with a general denial, effectively contesting the request for a declaration that they are covered by FEHA. Plaintiff was at least constructively informed from the start that defendants were asserting the religious entity exemption. Given our conclusion that defendants did not waive the FEHA religious entity exemption, we do not reach their arguments that the exemption is not something that can be waived as a matter of law.

### 3. Defendants Were Not Estopped From Asserting the Exemption

We review de novo the trial court's decision on undisputed facts that defendants were estopped from asserting the FEHA religious entity exemption. (*Feduniak v. California Coastal Com.* (2007) 148 Cal.App.4th 1346, 1360 (*Feduniak*).) "Whenever a party has, by his own statement or conduct, intentionally and deliberately led another to believe a particular thing true and to act upon such belief, he is not, in any litigation

arising out of such statement or conduct, permitted to contradict it." (Evid. Code, § 623.) The equitable estoppel doctrine is founded on the concepts of equity and fair dealing. It has four elements: " '(1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel has a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury.' " (*City of Goleta v. Superior Court* (2006) 40 Cal.4th 270, 279.) Importantly, equitable estoppel is " 'defensive in nature only, and "operates to prevent one [party] from taking an unfair advantage of another." ' " (*Moncada v. West Coast Quartz Corp.* (2013) 221 Cal.App.4th 768, 782; accord *Honeywell v. Workers' Comp. Appeals Bd.* (2005) 35 Cal.4th 24, 38 [equitable estoppel " 'is applied defensively; it operates to prevent one from taking an unfair advantage of another but not to give an unfair advantage to one seeking to invoke the doctrine' "].)

Defendants argue that the trial court erred in applying estoppel because plaintiff invoked it offensively to prevent defendants from relying on an otherwise viable defense to FEHA liability. Plaintiff does not address that argument. Given that the weight of California authority has limited equitable estoppel to defensive use (e.g., a landowner seeking to estop a government agency from enforcing land use restrictions based on prior conduct by the agency (*Feduniak*, *supra*, 148 Cal.App.4th at p. 1361)), the trial court erred in allowing plaintiff to assert it offensively.

Even assuming plaintiff could use equitable estoppel offensively, the record does not support estopping defendants from asserting the religious entity exemption. We can assume that before the litigation defendants were at least constructively aware of the religious entity exemption and that plaintiff did not know the exemption existed. But crucial to estoppel—and missing here—is conduct by the party to be estopped that causes detrimental reliance by the other party. The employee handbook is ambiguous and makes no affirmative representation that FEHA will apply. Defendants' failure to raise the

26

FEHA religious entity exemption during the EEOC administrative proceedings was reasonable because the EEOC was explicitly not investigating a possible FEHA violation. And defendants' general denial informed plaintiff they were contesting plaintiff's argument that the religious entity exemption did not apply. Plaintiff argues he "detrimentally relied on [defendants'] silence about the exemption in pursuing his claims and expending his resources in litigation," but the FEHA exemption was only one of several causes of action all relating to common operative facts. There is no indication plaintiff would have abandoned the FEHA cause of action had he known earlier that defendants would assert the religious entity exemption.

As we have concluded under California law that the trial court erred in estopping defendants from asserting FEHA's religious entity exemption, we do not reach the parties' arguments related to non-binding federal authorities interpreting the State of Washington's anti-discrimination law. (E.g., *Donelson v. Providence Health & Services-Washington* (E.D.Wash. 2011) 823 F.Supp.2d 1179, 1184–1185 [rejecting estoppel based on employee handbook; "a pledge not to *discriminate* is not necessarily inconsistent with a later claim of *exemption*" from state's anti-discrimination law].)

### 4. Plaintiff's Textual Argument is Unpersuasive

Plaintiff argues that even if FEHA's religious entity exemption would ordinarily apply to defendants as "employers," they are nonetheless subject to the FEHA prohibition on retaliation by "any employer, labor organization, employment agency, *or person*." (Gov. Code, § 12940, subd. (h), italics added.)

Government Code section 12926 defines terms used in the FEHA statutory scheme. Subdivision (d) of that section states: " 'Employer' includes any person regularly employing five or more persons, or any person acting as an agent of an employer, directly or indirectly, the state or any political or civil subdivision of the state, and cities, except as follows: [¶] 'Employer' does not include a religious association or corporation not organized for private profit." Each subdivision of Government Code

27

section 12940 prohibits certain entities or individuals from engaging in certain unlawful employment practices. (Unspecified subdivision references are to this section.) For example, subdivision (a) prohibits an "employer" from discriminating against employees based on race, religious creed, or other characteristics. Subdivision (c) prohibits "any person" from discriminating against another person "in the selection, termination, training, or other terms or treatment of that person in any apprenticeship training program." And subdivision (h) is a catch-all provision prohibiting retaliation, which states it is an unlawful employment practice for "any employer, labor organization, employment agency, or person to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part."

Plaintiff's textual argument is based on the word "person" in subdivision (h)'s list of entities and individuals that may not retaliate. But the list of entities and individuals in subdivision (h) uses the disjunctive "or," suggesting that each term is a separate category of entity or individual. Because we have already determined that defendants (as a single employer) were plaintiff's employer, they fall under the "employer" category for purposes of subdivision (h). And as employers that are religious entities, they are exempt from FEHA liability. Plaintiff points to nothing in the text or legislative history of FEHA suggesting a legislative intent to limit the exemption or effectively eliminate it in the context of retaliation.

In *Jones v. Lodge at Torrey Pines Partnership* (2008) 42 Cal.4th 1158 (*Jones*), the Supreme Court discussed the legislative history behind the word "person" in Government Code section 12940, subdivision (h). Jones sued his employer and his supervisor under FEHA for, among other things, retaliation. After the intermediate appellate court determined that an individual could be held personally liable for retaliation, the Supreme Court granted review to determine whether "the use of the word 'person' in subdivision (h) to describe who may not retaliate—compels the conclusion that all

28

persons who engage in prohibited retaliation are personally liable, not just the employer." (*Jones*, at pp. 1160, 1162.) In the course of determining that individuals cannot be held personally liable (based on reasoning not at issue here), the *Jones* court looked to the legislative history behind adding the word "person" to subdivision (h). The *Jones* court concluded that the Legislature "added the word 'person' merely to conform to the fact that some other parts of [section 12940] also use the word 'person.' " (*Jones*, at p. 1173.)

Our conclusion is consistent with *Jones*. The legislative history discussion in *Jones* demonstrates that the addition of the word "person" to Government Code section 12940, subdivision (h) was to ensure that the catch-all retaliation subdivision included all entities covered by the preceding subdivisions. Here again, plaintiff points to no legislative history indicating the Legislature *also* intended by that addition to allow an employee fired by a religious entity employer to circumvent the religious entity exemption by characterizing the employer as a "person" for purposes of a retaliation suit.

We conclude that defendants are exempt from FEHA. The jury verdict finding defendants liable under FEHA cannot stand.

## C. WHISTLEBLOWER INSTRUCTIONS

The parties agree on appeal that the trial court instructed the jury with the wrong version of Labor Code section 1102.5 when it used the version in effect at the time of trial rather than the version in effect when plaintiff was terminated. (See *Diego v. Pilgrim United Church of Christ* (2014) 231 Cal.App.4th 913, 921, fn. 7.) Defendants acknowledge that the trial court's error was caused by the parties because both proposed whistleblower instructions were based on the wrong version of the statute. Though it is the responsibility of counsel to propose correct instructions (*Metcalf v. County of San Joaquin* (2008) 42 Cal.4th 1121, 1130–1131), the failure of a trial court "to instruct on material issues and controlling legal principles ... may amount to reversible error." (*Agarwal v. Johnson* (1979) 25 Cal.3d 932, 951, disapproved on other grounds by *White v. Ultramar, Inc.* (1999) 21 Cal.4th 563, 574, fn. 4.)

29

### 1. Factual Background

Plaintiff e-mailed the EEOC five days before he was terminated. The e-mail read, in full: "Hello my name is Jeremiah Mathews and I work for a small company in Santa Cruz CA. and feel I have clearly been retaliated against in relation to another employee[']s sexual harassment complaints. We have both complained to CA[']s Dept. of Fair Employment but were hoping to get a fed agency complaint going too. If you cannot help us how do I obtain the right to sue cert. Please refer to other agencies (any) that can help. My home # is [redacted] my cell is [redacted]. Also you have my e-mail; but my address is [redacted]. Please send me any/all info you have I really need help." (Capitalization omitted; otherwise verbatim.) Plaintiff received an automatically generated e-mail response from the agency the same day. The following day he received another e-mail from the EEOC stating that based on the "information you provided in your e-mail, your situation may be covered by the laws we enforce" and instructing plaintiff that if he believed his "employer's or former employer's actions are retaliatory" he could use an EEOC online assessment tool and fill out an online questionnaire. The same day plaintiff e-mailed the EEOC he also sent an e-mail to the Church's general counsel Minton informing her that he was "pursuing state and federal complaints" due to what he perceived as an unsatisfactory response to the harassing text message investigation. (Capitalization omitted.) Plaintiff did not file his official charge of discrimination with the EEOC until several months after he was terminated.

On the special verdict form under the heading "Protected Activity," the jury responded in the affirmative to the following question: "Did Jeremiah Mathews report sexual harassment and/or retaliation to a state or federal agency before he was terminated?" The jury also responded in the affirmative to the following question in the Labor Code section 1102.5 section of the special verdict form: "Did Happy Valley Conference Center or Community of Christ believe that Jeremiah Mathews had disclosed or might have disclosed to an employee with authority to investigate, discover, or correct

30

legal violations/noncompliance, or that he had disclosed or might have disclosed to a government agency that his supervisor had sexually harassed male subordinates or, that he had been retaliated against for reporting sexual harassment or engaging in other protected activities?"

## 2. Changes to Labor Code Section 1102.5, Subdivision (b)

At the time plaintiff was terminated, Labor Code section 1102.5, subdivision (b) provided: "An employer may not retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation." (Lab. Code, former § 1102.5, subd. (b); Stats. 2003, ch. 484, § 2, p. 3518.) But the jury was instructed based on the version of Labor Code section 1102.5, subdivision (b) in effect at the time of trial, which reads: "An employer, or any person acting on behalf of the employer, shall not retaliate against an employee for disclosing information, or because the employer believes that the employee disclosed or may disclose information, to a government or law enforcement agency, to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance, or for providing information to, or testifying before, any public body conducting an investigation, hearing, or inquiry, if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties."

The relevant difference between the two versions relates to the timing of the employee's report to a government agency. Whereas now an employer violates the statute if it retaliates against an employee whom the employer merely believes has made a report to a government agency, courts interpreting the version in effect in 2012

31

concluded that liability was triggered for retaliatory actions taken only after the employee *actually* reported the employer. (See *Rope v. Auto-Chlor System of Washington, Inc.* (2013) 220 Cal.App.4th 635, 649, superseded by statute on another ground [finding Labor Code former section 1102.5, subdivision (b) did not cover " 'anticipatory' or 'preemptive' retaliation" taken before the employee reported the employer].)

### 3. The Error Was Harmless

The jury specifically found that "Jeremiah Mathews report[ed] sexual harassment and/or retaliation to a state or federal agency before he was terminated." The incorrect jury instruction was therefore harmless so long as substantial evidence in the record supports the jury's finding. (*Zhadan*, *supra*, 100 Cal.App.3d at p. 833.)

In the e-mail plaintiff sent to the EEOC before he was terminated, he stated that he worked for a small company in Santa Cruz and that he believed he had been retaliated against in relation to another employee's sexual harassment complaint. He sought assistance in obtaining a right to sue certification. That e-mail is substantial evidence supporting the jury's finding that plaintiff reported retaliation to a government agency before he was terminated. It briefly summarized the issue; it was sent to a government agency; and plaintiff's e-mail to Minton placed defendants on notice that he was pursuing state and federal complaints.

Defendants argue that the e-mails "did not disclose who was the alleged retaliator or what was the alleged retaliation." But neither version of the statute requires that level of specificity. Labor Code former section 1102.5, subdivision (b) prohibited retaliation in response to disclosure to the government of "information ... where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute." The jury could reasonably conclude that plaintiff's e-mail met that standard because it stated he was being retaliated against in response to another employee's sexual harassment complaint. And given that plaintiff sent the e-mail to an agency that regulates

32

employers, it is reasonable to infer that he was alleging that his employer was the entity retaliating against him.

Because substantial evidence supports the jury's finding that plaintiff reported retaliation to a government agency before he was terminated, the error in the Labor Code section 1102.5, subdivision (b) instruction was harmless. Defendants' argument that the Church cannot be liable because Happy Valley, rather than the Church, terminated plaintiff is without merit in light of the jury's single employer special verdict finding.

## D. BREACH OF CONTRACT

Defendants do not contest the jury's finding that Happy Valley breached an implied-in-fact contract with plaintiff. Defendants argue that insufficient evidence supports the breach of contract finding against the Church because "the employee handbook is Happy Valley's handbook, not the Church's." Defendants' argument differentiating between Happy Valley and the Church assumes that the single employer finding did not apply to the breach of contract cause of action. We requested supplemental briefing regarding whether the single employer finding made the Church jointly liable for breach of contract, and defendants responded that the single employer doctrine applies only "in the limited context of title VII, FEHA, and Labor Code violations." Resolving the issue requires reviewing the special verdict form and the jury instructions.

The stipulated special verdict form is 11 pages long. It begins with two questions that appear to relate to all causes of action. The first asks whether plaintiff was employed by Happy Valley, which the jury answered in the affirmative. The second is the single employer question, which the jury also answered in the affirmative: "When Jeremiah Mathews was discharged from his employment in May 2012, were Happy Valley Conference Center and the Community of Christ sufficiently related so as to be considered a 'single employer' of Jeremiah Mathews, and therefore jointly responsible for each other's acts?" The single employer question does not limit application of that

33

finding to any particular causes of action. The jury instruction defining "single employer" similarly referenced "determining whether Happy Valley Conference Center and Community of Christ constitute a 'single employer' for purposes of this action."

Following those general questions, the special verdict form asks questions specific to each cause of action. Under the "Breach of Contract" heading, the jury answered in the affirmative the following question: "Did Happy Valley Conference Center or Community of Christ promise, by words or conduct, to provide Jeremiah Mathews a work environment free of unlawful harassment and to not retaliate against him for filing a complaint and to not permit retaliation against him by management employees or coworkers?" The jury also answered in the affirmative the question whether "Happy Valley Conference Center or Community of Christ breach[ed] the terms of their employment relationship with [plaintiff] by retaliating against him[.]"

Defendants attempt to separate Happy Valley and the Church for breach of contract purposes by arguing that the single employer doctrine does not apply to breach of contract causes of action. But defendants point to no authority that precludes applying the single employer doctrine to a breach of contract. The stipulated special verdict form did not limit the single employer finding to specific causes of action, which left the jury free to apply that doctrine to all causes of action. The parties at least tacitly agreed to apply the single employer doctrine to all causes of action because had the breach of contract cause of action not been based on defendants acting as a single employer, the parties would have included in the special verdict form separate questions differentiating the acts of Happy Valley on one hand and the acts of the Church on the other.

As we have previously discussed, substantial evidence supports the jury's single employer finding. Specific to the Happy Valley employee handbook issue, the evidence showed that the Church received a copy to review and provided no feedback. Taken together, the jury could reasonably infer that the Church's lack of changes to the handbook was tacit acceptance of its terms. To the extent defendants' argument can be

34

construed as challenging the special verdict question as defective, they forfeited the argument by failing to raise it in the trial court. (See *Little v. Amber Hotel Co.* (2011) 202 Cal.App.4th 280, 299–300 [party forfeits challenge to " 'merely ambiguous' " special verdict form by failing to seek clarification before the jury is discharged].)

The evidence supports the jury's special verdict finding that defendants as a single employer breached the implied-in-fact contract with plaintiff. (Defendants also contend the jury's breach of the implied covenant of good faith and fair dealing finding is superfluous in light of its breach of contract finding, but we do not reach that argument because defendants neither request relief as to the breach of implied covenant finding nor explain why that finding prejudices them.)

### E. ATTORNEY'S FEES

Defendants' challenge to the attorney's fee award is foreclosed by our conclusion that substantial evidence supports the jury's single employer finding. Their attorney's fees argument depends on reversal of both the Title VII and FEHA verdicts, and by affirming Title VII liability we also affirm plaintiff's legal entitlement to attorney's fees (defendants do not challenge as excessive the *amount* of the fee award). (See 42 U.S.C. § 2000e-5(k) ["In any action or proceeding under this [subchapter] the court, in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee"].) As defendants challenge only plaintiff's legal entitlement to fees, and plaintiff was entitled to attorney's fees under Title VII, defendants have not demonstrated error in the attorney's fee award.

### F. PUNITIVE DAMAGES UNDER THE WHISTLEBLOWER STATUTE

Defendants' opening brief stated that the whistleblower statute (Lab. Code, § 1102.5, subd. (b)) does not cap punitive damages. (Citing *Weinstein v. HBE Corp.* (C.D.Cal. 2014) 2014 WL 5602510 [nonpub. opn.] (*Weinstein*).) We requested supplemental briefing regarding whether defendants' whistleblower liability provides an adequate basis for all compensatory and punitive damages awarded. Without addressing

35

their tacit concession from the opening brief, defendants now argue that plaintiff was not entitled to punitive damages under the whistleblower statute because that statute limits recovery to contract damages. As plaintiff points out, multiple federal cases applying California law have affirmed awards of punitive damages for violations of the whistleblower statute (see *Teutscher v. Woodson* (9th Cir. 2016) 835 F.3d 936, 956 (*Teutscher*)), but it does not appear that any has specifically addressed whether such awards are legally available under that statute. Whether the whistleblower statute allows for recovery of punitive damages is a question of statutory interpretation over which we exercise our independent judgment to ascertain the Legislature's intent so as to effectuate the purpose of the law. (*Hunt v. Superior Court* (1999) 21 Cal.4th 984, 1000.)

### 1. Punitive Damages Are Available Under Labor Code Section 1102.5

The general rule regarding punitive damages is stated in Civil Code section 3294, subdivision (a): "In an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant." The whistleblower statute does not state what damages are recoverable if it is violated. It has one reference to "penalties" in subdivision (f), which provides: "In addition to other penalties, an employer that is a corporation or limited liability company is liable for a civil penalty not exceeding ten thousand dollars ($10,000) for each violation of this section." (Lab. Code, § 1102.5, subd. (f).) Also relevant is Labor Code section 1105, which states that "[n]othing in this chapter [containing Labor Code section 1102.5] shall prevent the injured employee from recovering damages from his employer for injury suffered through a violation of this chapter."

"When a statute recognizes a cause of action for violation of a right, all forms of relief granted to civil litigants generally, including appropriate punitive damages, are available unless a contrary legislative intent appears." (*Commodore Home Systems, Inc.*

36

*v. Superior Court* (1982) 32 Cal.3d 211, 215 (*Commodore*) [determining that punitive damages are available in FEHA private actions].)  But "where a statute creates a right that did not exist at common law and provides a comprehensive and detailed remedial scheme for its enforcement, the statutory remedy is exclusive."  (*Rojo v. Kliger* (1990) 52 Cal.3d 65, 79 [rejecting employer's argument that FEHA was the exclusive legal theory under which employees could challenge sex discrimination in the workplace].)

Defendants point to nothing in the whistleblower statute or its legislative history suggesting any intent to limit the types of damages available to contract damages.  Labor Code section 1105 states that nothing shall prevent an injured employee from recovering damages for a violation of Labor Code section 1102.5.  Labor Code section 1102.5, subdivision (f) states that the penalty specified therein is to be imposed in *addition* to other penalties.  The whistleblower statute is not a complex and detailed remedial scheme such that the remedy mentioned in the statute should be deemed to be exclusive.  And the availability of punitive damages is consistent with federal authorities that have upheld punitive damages awards, though we acknowledge none addressed the issue presented here.  (E.g., *Teutscher*, *supra*, 835 F.3d at p. 956; *Thomas v. Costco Wholesale Corp.* (C.D.Cal. 2014) 2014 WL 819396 [nonpub. opn.]; *Weinstein*, *supra*, 2014 WL 5602510 [nonpub. opn.].)  We conclude that punitive damages are recoverable for a violation of the whistleblower statute.

In arguing that plaintiff is restricted to contract remedies for defendants' violation of the whistleblower statute, plaintiff relies on dictum from *Lockheed Aircraft Corp. v. Superior Court* (1946) 28 Cal.2d 481 (*Lockheed*).  In that case several individuals sued their former employer, alleging they had been wrongfully discharged in violation of Labor Code section 1101 (prohibiting employers from " '[c]ontrolling or directing or tending to control or direct the political activities or affiliations of employees' ").  (*Lockheed,* at pp. 483–484.)  The former employer petitioned for a writ of prohibition, arguing among other things that there was no civil private right of action to enforce Labor

37

Code section 1101 because Labor Code section 1103 stated that a violation of Labor Code section 1101 was a misdemeanor, rendering it an exclusively penal statute. Citing Labor Code section 1105, the Supreme Court determined that "upon violation of [Labor Code section 1101], an employee has a right of action for damages for breach of his employment contract." (*Lockheed,* at p. 486.)

The issue in *Lockheed* was whether a private right of action exists for violations of the statute, not the measure of damages for statutory violations. And the decision predated Labor Code section 1102.5 as well as the later California Supreme Court decisions like *Commodore* that provide guidance about how to determine the measure of damages for statutory violations. Because we conclude that punitive damages are available for a violation of Labor Code section 1102.5, we do not reach the parties' arguments about *Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167.

### 2. Punitive Damages Award Was Not Unconstitutionally Excessive

Because the whistleblower statute does not cap the amount of punitive damages (Lab. Code, § 1102.5, subd. (b); Civ. Code, § 3294, subd. (a)), a punitive damages award will be reversed only if it is grossly excessive violating due process. (*BMW of North America, Inc. v. Gore* (1996) 517 U.S. 559, 568.) Defendants' argument that the punitive damages award was excessive assumes reversal of the single employer finding (defendants contend that the $500,000 punitive damages award is disproportionate to Happy Valley's ability to pay given Happy Valley's relatively low net worth). Because defendants were properly treated as a single employer, and the evidence showed defendants' joint net worth was over $179 million, the punitive damages award was not unconstitutionally excessive.

### G. COMPENSATORY DAMAGES

Defendants challenge the compensatory damages award on several bases. They contend that breach of contract liability supports only economic losses and prejudgment interest; that Title VII caps damages based on the size of the defendant-employer; and

38

that damages for a FEHA violation were inappropriate because defendants were exempt from FEHA liability. But we need not address those arguments because, as we have discussed, the whistleblower statute does not limit recovery to contract damages. Following the Supreme Court's guidance in *Commodore*, plaintiff was entitled as a whistleblower to "all forms of relief granted to civil litigants generally." (*Commodore*, *supra*, 32 Cal.3d at p. 215.) As such, the whistleblower statute violation is itself an adequate basis for all compensatory damages awarded by the jury.

## III.    DISPOSITION

The judgment is modified to delete any reference to liability under FEHA. As so modified, the judgment and the separate order awarding attorney's fees are affirmed. Plaintiff is entitled to his costs on appeal.

_____

Grover, J.

**WE CONCUR:**


_____

Greenwood, P. J.


_____

Danner, J.


**H043723, H044098 -** *Mathews v. Happy Valley Conference Center, Inc. et al.*

| | |
|---|---|
| Trial Court: | Santa Cruz County Superior Court<br>Superior Court No. CV179346 |
| Trial Judge: | Hon. John M. Gallagher |
| Counsel for Plaintiff/Respondent<br>JEREMIAH MATHEWS | Elizabeth Mary Peck<br> Peck-Law<br>Devin Cannell Coyle<br> Devin Coyle Law |
| Counsel for Defendants/Appellants<br>HAPPY VALLEY CONFERENCE<br>CENTER, INC. and COMMUNITY<br>OF CHRIST | Michon Marie Spinelli<br> Ropers, Majeski, Kohn & Bentley<br>S. Thomas Todd<br> Horvitz & Levy, LLP |

**H043723, H044098 -** *Mathews v. Happy Valley Conference Center, Inc. et al.*